IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LUCKY SHOALS COMMUNITY
ASSOCIATION, INC.,

PLAINTIFF,

v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY & LEE ZELDIN (IN HIS
OFFICIAL CAPACITY AS
ADMINISTRATOR OF THE EPA),

DEFENDANTS.

Civil Action No.

1:25-cv-07221-MLB

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendants United States Environmental Protection Agency (EPA) and Lee

Zeldin, sued in his official capacity as the administrator of the EPA, by and

through the United States Attorney for the Northern District of Georgia, hereby

file this motion to dismiss Plaintiff's Complaint (Doc. 1) pursuant to Fed. R. Civ.

P. 12(b)(1) because this Court does not have subject matter jurisdiction over this

case. Defendants submit herewith a memorandum of law in support of their

motion.

Respectfully submitted,

1

THEODORE S. HERTZBERG
    *United States Attorney*
    *600 U.S. Courthouse*
    *75 Ted Turner Drive SW*
    *Atlanta, GA 30303*
    *(404) 581-6000   fax (404) 581-6181*


/s/RODNEY H. ATREOPERSAUD
    *Assistant United States Attorney*
    Georgia Bar No. 309454
    Rodney.Atreopersaud@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| LUCKY SHOALS COMMUNITY ASSOCIATION, INC., | |
| PLAINTIFF, | Civil Action No. |
| *v.* | 1:25-cv-07221-MLB |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY & LEE ZELDIN (IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE EPA), | |
| DEFENDANTS. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Plaintiff brought this Complaint for declaratory and injunctive relief based on the EPA's decision to terminate Clean Air Act grants Plaintiff had received. The EPA concluded that grants previously made to Plaintiff, to support certain environmental justice initiatives, did not align with EPA's policy priorities and should therefore be discontinued. Congress then rescinded funding for Environmental and Climate Justice Block Grants in the One Big Beautiful Bill, which the President subsequently signed into law, thereby rescinding funds the Inflation Reduction Act ("IRA") made available under the Clean Air Act to Plaintiff. Nevertheless, Plaintiff's Complaint seeks to compel the EPA to provide

Plaintiff with grant funding under a terminated agreement that had been obligated to Plaintiff before the One Big Beautiful Bill went into effect. Plaintiff's Complaint should be dismissed for several reasons.

*First*, there is no longer any case or controversy and Plaintiff's claims are therefore moot. As mentioned above, Plaintiff's grant was terminated and remaining funding deobligated, and subsequently the One Big Beautiful Bill rescinded all unobligated funds supporting the Environmental and Climate Justice Block Grants provided for in section 138 of the Clean Air Act, which authorized the terminated grants here. *See* H.R. 1, 119th Cong., Sec. 60016, (1st Sess. 2025). This leaves no funding for EPA to obligate to Plaintiff under federal law. And the Court cannot make available funding that has been rescinded by Congress.

*Second*, even if this case was not moot, this Court still lacks subject matter jurisdiction over Plaintiff's claims, which, fundamentally seek to enforce a contractual grant agreement. Doc. 1 at ¶ 19, 24, 26, 29, 37-47. As the Supreme Court has explained, this argument sounds in contract and can be heard only in the Court of Federal Claims under the Tucker Act.

*Third*, and finally, the EPA Administrator has broad discretion to allocate the funds at issue here. As a result, the Court lacks jurisdiction under the

Administrative Procedures Act (APA) because those decisions are committed to agency discretion by law.

Accordingly, this Court should dismiss Plaintiff's Complaint.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A. Statutory Background.

Plaintiff seeks access to federal funding from grant programs appropriated through the Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 — specifically grant programs supporting the Environmental and Climate Justice Program Block Grants established in Section 138 of the Clean Air Act. The IRA appropriated $2.8 billion and provided that the EPA Administrator "shall use" the funds to provide grants to eligible entities "to carry out" specified activities "that benefit disadvantaged communities, as defined by the Administrator." 42 U.S.C. § 7438(a)-(b). Allowable activities included "community-led air and other pollution monitoring, prevention, and remediation;" "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events;" "reducing indoor toxics and indoor air pollution;" and "facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes." *Id*. § 7438(b)(2).

Congress rescinded all unobligated balances made available to fund the grant at issue here with the One Big Beautiful Bill (H.R. 1) which was signed into law on July 4, 2025. That statute, also entitled "An Act to Provide for Reconciliation," is an appropriations bill that includes rescissions of funding for various environmental programs in title VI of the bill. Section 60016 rescinded funding for the Environmental and Climate Justice Block Grants at issue here, stating "[t]he unobligated balances of amounts made available to carry out section 138 of the Clean Air Act (42 U.S.C. 7438) are rescinded."

## B. Relevant Executive Orders (EOs).

In the days after his inauguration, the President issued several Executive Orders setting forth his Administration's priorities and instructing agencies to pause funding to the extent permitted by law to allow time to review whether the funding aligns with those priorities. EO No. 14,154, 90 Fed. Reg. 8,353 (Jan. 20, 2025), titled *Unleashing American Energy*, declares the policy of the United States to encourage certain "energy exploration and production," guarantee the accessibility of "an abundant supply of reliable energy," and ensure that no federal funding is "employed in a manner contrary to the principles outlined in this section, unless required by law." *Id*. § 2(a), (c), (i). The EO further instructs agencies to "immediately pause the disbursement of funds" under the IRA to

4

assess "consistency with the law and the policy outlined in" the Executive Order. *Id.* § 7(a).

In the *Ending Radical and Wasteful Government DEI Programs and Preferencing* EO No. 14,151, 90 Fed. Reg. 8,339 (Jan. 20, 2025), the President declared that "Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great." *Id.*

Over the ensuing months, the EPA began issuing termination notices. As of May 2, 2025, all grants in support of the Environmental and Climate Justice block grant program had been terminated. Doc. 1 at ¶ 26.

### C. Plaintiff's Claims.

Lucky Shoals Community Association, Inc. ("Plaintiff" or "Lucky Shoals"), is a 204(c)(3) non-profit entity that facilitates "community and economic development in unincorporated Gwinnett County, GA, including in the area of clean energy and healthy environment." Doc. 1 at ¶ 6. Plaintiff alleged that it successfully applied for a grant under the Inflation Reduction Act and was awarded $19, 953,400.00 by the EPA on December 2, 2024. *Id.* at ¶¶ 16-19. Plaintiff's grant came from a $2.8 billion appropriation to the EPA to "award grants to monitor, prevent, and/or remediate harmful effects of pollution including climate change to benefit disadvantaged communities." *Id.* at ¶ 13.

Soon thereafter, on January 20, 2025 (inauguration day), the President issued an EO titled "Terminating the Green New Deal," and instructed "all Executive agencies to 'immediately pause disbursement of funds appropriated through the Inflation Reduction Act of 2022.'" *Id.* at ¶ 21. One day after inauguration, on January 21, 2025, "the White House Office of Management and Budget OMB and Kevin Hassett issued a memorandum instructing all federal agency heads to immediately pause disbursement of funds appropriated under the Inflation Reduction Act." *Id.* at ¶ 23. Then, on January 27, 2025, the "EPA issued a memorandum to staff, titled 'Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause,' purporting to freeze 'all disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by' the Inflation Reduction Act." *Id.* at ¶ 24. According to Plaintiff, the memorandum did not apply any individualized analysis, but instead it applied to all disbursements under the Inflation Reduction Act. *Id.*

On May 2, 2025, the EPA sent letters to various organizations terminating the Inflation Reduction Act's Community Change Grants program—including the Plaintiff's grant. *Id.* at ¶ 26. Plaintiff alleged that EPA Administrator Lee Zeldin was responsible for the grant termination. *Id.* at ¶ 27.

6

Plaintiff received a termination memorandum stating that the "'objectives of the award are no longer consistent with EPA funding priorities' and that the grant 'provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States.'" *Id.* at ¶ 29. Plaintiff alleged that the termination memorandum did not show any individualized analysis of Plaintiff's grants. *Id.* at ¶¶ 29-30.

Plaintiff alleged that the termination of its grant has "severely strained" its day-to-day operations. *Id.* at ¶¶ 37-38. According to Plaintiff, it "had to withdraw a purchase offer for $7 million for land for green space, and already other potential purchasers have made offers on the property." *Id.* at ¶ 37. Plaintiff also alleged that because of the grant termination, it is unable to "pay for personnel or services," the termination has "caused extreme distress among staff members and community partners," and it has "resulted in a loss of good will among Lucky Shoals's community partners." *Id.* at ¶¶ 40-45. Additionally, Plaintiff claimed organizational and reputational damage. *Id.* at ¶ 47.

Plaintiff brings this suit alleging that the grant termination was arbitrary and capricious in violation of the Administrative Procedures Act (APA). *See e.g. id.* at ¶ 60. It seeks, *inter alia*, to "enjoin Defendants from their purported termination

of already-awarded Environmental Justice Block Grant program … and to compel to effect such program…" Doc. 1 at p. 21. In other words, Plaintiff seeks an order compelling the EPA to provide it with funds Plaintiff had been awarded under the IRA, but that was rescinded under the One Big Beautiful Bill. For reasons discussed below, Plaintiff's suit should be dismissed.

## II. ARGUMENTS AND CITATIONS TO AUTHORITY

### A. Legal Standards.

#### 1. Mootness.

Federal courts lack the authority to decide moot questions or abstract propositions of law because they do not constitute "cases or controversies" under Article III of the Unites States Constitution. *Preiser v. Newkirk*, 422 U.S. 395, 401-403 (1975); *Soliman v. United States ex rel., INS*, 296 F.3d 1237, 1242 (11th Cir. 2002); *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335 (11th Cir. 2001). If a claim is moot, the court lacks subject matter jurisdiction over it. *Sec. and Exch. Comm'n v. Med. Comm. for Human Rights*, 404 U.S. 403, 406-407 (1972). In order for a court to retain jurisdiction, a real controversy must exist, not only when suit is filed, but throughout all stages of the case. *Al Najjar*, 273 F.3d at 1355; *Chiles v. Thornburgh*, 865 F.2d 1197, 1202 (11th Cir. 1989); *see Florida Ass'n of Rehab. Facilities*, *Inc. v. Florida Dep't of Health and Rehab. Servs.*, 225 F.3d 1208, 1217 (11th Cir. 2000) ("Any decision on the merits of a moot case or issue would be an impermissible

advisory opinion."). Furthermore, a case becomes moot when a court "cannot grant any effectual relief … in favor of the [plaintiff]." *Calderon v. Moore*, 518 U.S. 149, 150 (1996).

### 2. 12(b)(1) subject matter jurisdiction.

Federal Rule of Civil Procedure 12(b)(1) authorizes a party to move to dismiss a claim for lack of subject matter jurisdiction. If the Court lacks subject matter jurisdiction, the Court must dismiss the claim. Fed. R. Civ. P. 12(h)(3). Therefore, determining the existence of subject-matter jurisdiction is a threshold inquiry that a court is required to consider before reaching the merits of the case. *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2010). Moreover, "the plaintiff bears the burden of proof that subject-matter jurisdiction does exist, and when challenged, the plaintiff must support the allegations." *Holland v. Dep't of Health & Human Servs.*, 51 F. Supp. 3d 1357, 1363 (N.D. Ga. 2014); *see OSI v. United States*, 285 F.3d 947, 951 (11th Cir. 2002).

### B. Plaintiff's Claims are Moot, and the Court Therefore Lacks Jurisdiction Over Plaintiff's Claims.

Following EPA's termination of Plaintiff's Environmental and Climate Justice Block Grant, Congress rescinded all funding appropriated to EPA to implement the climate justice block grant program in the One Big Beautiful Bill Act, which was signed into law on July 4, 2025. Accordingly, Plaintiff's claims are now moot.

The Appropriation Clause of the United States Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." Art. 1, § 9, cl. 7. The Eleventh Circuit has reaffirmed this bedrock constitutional principle when it held that "payments of money from the Federal Treasury are limited to those authorized by statute." *Affordable Bio Feedstock, Inc. v. United* States, 42 F.4th 1288, 1289 (11th Cir. 2022) (quoting *Office of Personnel Management v. Richmond*, 496 U.S. 414, 416 (1990)). Here, Congress has rescinded all funding for the program that Plaintiff is asking this Court to reinstate and order Defendants to disburse funds from—funds which no longer exist as of July 4, 2025. See An Act to Provide for Reconciliation, H.R. 1, tit. VI, section 60016 ("The unobligated balances of amounts made available to carry out section 138 of the Clean Air Act (42 U.S.C. 7438) are rescinded."). Where Congress has clearly spoken, the Court cannot state otherwise. To the extent Plaintiff contends that the Court can grant equitable relief despite the clear language of § 60016, such relief is "unavailable in a claim against the government for funds from the public treasury." *Affordable Bio Feedstock*, 42 F.4th at 1892.

A similar situation was before the D.C. Circuit in *Rochester Pure Waters Dist.* There, the D.C. Circuit was considering an appeal of a district court order requiring EPA to set aside funds to cover the plaintiffs' separate and ongoing

10

litigation because Congress was expected to rescind those funds imminently. *Id.* at 182. Although the plaintiffs had received a temporary restraining order directing EPA to preserve the funds at risk of rescission, Congress nevertheless passed the bill fully rescinding the funds. *Id.* at 182-83. The plaintiffs then moved for a permanent injunction, which the court granted to "'ensure that plaintiffs will have an adequate remedy should they prevail on their administrative appeals.'" *Id.* at 183 (quoting the district court). The D.C. Circuit found that while it is permissible for a court to award an injunction to preserve funds beyond their statutory lapse date, the case of a statutory rescission is "critically different from [] lapses of budget authority," because Congress had made its intent clear by rescinding the appropriation that would have covered the plaintiffs' claims. *Id.* at 184-85. Once Congress did so, "the funds reverted to the Treasury … notwithstanding the district court's temporary restraining order as *that order was not, nor could it have been, binding on Congress.*" *Id.* at 185 (emphasis added).

By granting the requested relief in this moot case, this Court would be making the same error as the district court in *Rochester*. Congress was fully aware when it passed the One Big Beautiful Bill that these Environmental and Climate Justice Block grants had been awarded, terminated, and the funds de-obligated. But Congress determined it no longer wished to fund these programs and therefore rescinded all unobligated funds. And the textual command of the

11

Appropriations clause is clear—"no money can be paid out of the treasury unless it has been appropriated by an act of Congress." *Consumer Fin. Prot. Bureau v. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (citation omitted). Congress speaks clearly both when it appropriates funds *and* when it rescinds appropriation. For Plaintiff to prevail, it must identify an appropriation that EPA may use to fulfill the grant agreements. Outside of an appropriation authorizing funds for the block grant program, there is no way for Plaintiff to recover. Therefore, there is no longer a live controversy for which this Court can grant effective relief. Accordingly, Plaintiff's Complaint should be dismissed.[1]

Should the Court disagree on mootness, it still lacks jurisdiction because fundamentally Plaintiff is seeking to enforce a contractual agreement with the EPA, and its claims can only be brought in the Court of Federal Claims.

### C. Plaintiff's Termination-Related Claims are Essentially Contract Claims That Must be Brought in the Court of Federal Claims.

"If the court determines at any time that it lacks subject-matter jurisdiction,

---

[1] In a footnote, Plaintiff acknowledges that Congress rescinded "*unobligated balances of amounts made available to carry out*" § 138. Doc. 1 at 5, n. 2 (emphasis in Complaint). As EPA stated in its termination letter, the only legal obligation remaining is for allowable pre-termination and close-out costs. The EPA has funds to cover those costs, but has no authority or obligation to fund implementation of Plaintiff's grant beyond these pre-termination and closeout costs.

the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). In a nearly identical

challenge that also involved EPA grants, the Fourth Circuit recently found that

district courts do not have jurisdiction over these types of contractual disputes

that are governed by the Tucker Act. *Sustainability Inst. v. Trump*, 2026 U.S. App.

LEXIS 1431, *21-22 (4th Cir., Jan. 21, 2026).

It is settled law that "the United States, as a sovereign entity, is immune from

suit save as it consents to be sued . . ., and the terms of its consent to be sued in

any court define that court's jurisdiction to entertain the suit." *United States v.*

*Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v. Sherwood*, 312 U.S. 584,

586 (1941)). Any waiver of the United States' sovereign immunity "must be

scrupulously observed, and not expanded, by the courts." *Turner ex rel. Turner v.*

*United States*, 514 F.3d 1194, 1200 (11th Cir. 2008) (quoting *Suarez v. United States*,

22 F.3d 1064, 1065 (11th Cir. 1994) (per curiam)).

Although the APA provides a limited waiver of the Government's sovereign

immunity, it does not apply "if any other statute that grants consent to suit

expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. That

carve-out "prevents plaintiffs from exploiting the APA's waiver to evade

limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

One example of such an implicit limitation on APA relief involves suits against the United States that sound in contract where a party seeks access to funds that it believes the government is obligated to pay under a contract or a grant. The limitation exists because the Tucker Act waives immunity for those types of contractual suits. The Tucker Act provides that the "United States Court of Federal Claims *shall have* jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (emphasis added). Hence, "the Tucker Act 'impliedly forbids'" bringing "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004). Indeed, the Eleventh Circuit has held that "the Tucker Act requires that claims against the United States for amounts in excess of $ 10,000 founded on contracts with the United States must be brought in the Court of Claims." *Friedman v. United States*, 391 F.3d 1313, 1315 (11th Cir. 2004) (*citing Mark Dunning Indus., Inc. v. Cheney*, 934 F.2d 266, 269 (11th Cir.1991) (sting citation omitted).

This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive

14

commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). This jurisdictional barrier is mandatory and for good reason. It ensures that contract claims against the Government are channeled into a court that has "unique expertise." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

So, if a case sounds in contract and exceeds $10,000, the Tucker Act applies, and this Court does not have jurisdiction over it. Here, Plaintiff seeks undoing of the grant-termination and a reward of over $19,000,000 dollars—in other words, over $10,000. Doc. 1 at ¶ 19 & pp. 19-22. Thus, the only question remaining is whether Plaintiff's APA claims for injunctive relief are "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

Courts consider two factors in assessing whether an action raises a contract claim governed by the Tucker Act: "the source of the rights upon which [Plaintiffs] base[ their] claims" and "the type of relief sought."' *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). In assessing "the source of the rights," courts consider whether the "plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights 'exist prior to and apart from rights created under the contract,' and whether the plaintiff 'seeks to enforce any duty imposed upon' the government 'by the relevant contracts to which' the government 'is a party.'" *Crowley Gov't Servs., Inv. v. Gen.*

*Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir., 2022) (citation modified). When a claim is premised on an agreement with the Government, depends upon the Government's having breached that agreement, and seeks to compel the Government to pay sums due under the agreement—it is a Tucker Act claim, not an APA claim. *See Megapulse,* 672 F.2d at 967-71.

Applying those principles, Plaintiff's claims are essentially contract claims that must be brought in the United States Court of Federal Claims. The grant instruments are plainly "the source of the rights upon which" Plaintiff base its claims. *Megapulse*, 672 F.2d at 968. The asserted right to millions of dollars in taxpayer funds arises solely from the grants and "in no sense…exist[s] independently of those grants." *Spectrum*, *Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir., 1985). Plaintiff would have no claim absent the Government's alleged breach of the grant agreements. No appropriations statute, no provision of the Inflation Reduction Act, and no agency regulation confers any right to payment on Plaintiff. At bottom, absent the grants, Plaintiff would not have any claim.

Moreover, the only means by which Plaintiff can achieve its requested relief is through the restoration of their grants. Plaintiff explicitly seeks an order prohibiting "Defendants from otherwise impeding, blocking, cancelling, or terminating Lucky Shoal's access to its funds…" Doc. 1 at p. 21. Additionally,

Plaintiff asserts a host of injuries stemming from termination of access to the funds. *Id.* at ¶¶ 37-47. Thus, what Plaintiff wants is "the classic contractual remedy of specific performance" to cure alleged damages caused by non-performance. *Spectrum*, 764 F.2d at 894.

As mentioned at the beginning of this section, the Fourth Circuit recently found that the Tucker Act deprived district courts of jurisdiction over these types of contractual disputes in a case with similar facts. *Sustainability Inst. v. Trump*, 2026 U.S. App. LEXIS at *22-23. In doing so, it relied on the Supreme Court's decisions in *Department of Education v. California*, 604 U.S. 650 (2025) and *Nat'l Insts. of Health v. Am. Pub. Health, Ass'n.*, 145 S. Ct. 2658 (2025).

In *California*, the Department of Education (DOE) decided to cancel, "with no meaningful explanation," more than 100 grants the federal government had previously awarded to public school and universities across the country. 604 U.S. at 653. Those grants were authorized by Congress to address "a nationwide shortage of qualified teachers." *Id.* at 654. On February 5, 2025, the Acting Secretary of Education issued an internal directive requiring DOE personnel to review "issued grants" to "ensur[e] that Department grants do not fund discriminatory practices" that are "'contrary to law or to the Department's policy objectives" and that "all grants are free from fraud, abuse, and duplication." *Id.* at 655 (citation omitted). Two days later, grant recipients began to receive letters

from the DOE announcing the termination of their grant awards. *Id.* In a *per curiam* opinion, the Supreme Court stayed the district court's order grating an injunction pending appeal, finding that "the Government [was] likely to succeed in showing that the District Court lacked jurisdiction" to issue the order. *Id* at 651. The Court explained that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

In *National Institutes of Health*, the district court had "vacat[ed] the Government's termination of various research-related grants." 145 S. Ct. at 2659. The Supreme Court again stayed the district court's order after finding that "[t]he Administrative Procedure Act's limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* (citations omitted). The

18

Government was therefore likely to succeed in showing that the district court lacked jurisdiction to enter the order vacating the grant terminations. *See id.*

There is no meaningful difference between the Environmental Justice Grant here, and the teaching and research-related grants in *California* and *National Institute of Health*. As the Fourth Circuit found, all these cases involve claims the Government froze or terminated grants *en masse*, allegedly without individualized analysis. *Sustainability Inst.*, 2026 U.S. App. LEXIS at * 15. And all plaintiffs seek restoration of their specific grants under the APA. *Id.* at * 16.

It is no answer for Plaintiff that *California* did not involve constitutional claims. Regardless of how a claim is styled, a district court lacks jurisdiction if the claim "is in its essence contractual." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (internal quotation marks omitted). Plaintiff cannot escape the procedural limitations of the Tucker Act by "masquerading its claims as suits for injunctive or declaratory relief" or by "lumping [their] contract claims together and denominating them a constitutional violation." *Metadure Corp. v. United States*, 490 F. Supp 1368, 1371, 1373 (S.D.N.Y. 1980). Plaintiff advances no bona fide, freestanding constitutional claims not anchored by its fundamentally contractual claims.

As the Supreme Court explained in *Dalton v. Specter*, not "every action by the President, or by another executive official, in excess of his statutory authority is

*ipso facto* in violation of the Constitution." 511 U.S. 462, 472 (1994). Rather, the Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. (collecting cases). The Constitution is implicated, for example, if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id*. at 473.

Here, Plaintiff's asserted constitutional claims are really "statutory one[s]." *Id.* at 474. Plaintiff asserts that Defendants have exceeded their statutory authority by withholding funds authorized by the Inflation Reduction Act. Doc. 1 at ¶¶ 11-14, 62, 67, 67 ("Defendants violated the Inflation Reduction Act."). Setting aside the fact that the One Big Beautiful Bill Act terminated the EPA's access to unobligated balances to provide Plaintiff with the demanded awards, Plaintiff is simply recharacterizing its statutory argument as a violation of the constitutional separation of powers, or as amending the relevant statutes in violation of the

Presentment Clause (*see* Doc. 1 at ¶ 72-74 & 77), but that is precisely the sleight of hand rejected in *Dalton*.

Plaintiff's APA and separation of powers arguments fail for lack of subject matter jurisdiction. The only permissible reading of Plaintiff's Complaint is that it seeks "to obtain [a] financial benefit" or "monetary relief" from the Government. *Suburban Mortg. Assocs. v. U.S. Dep't of Hous. & Dev.*, 480 F.3d 1116, 1126 (Fed. Cir. 2007). That is a contractual claim the court lacks jurisdiction to hear. *See also California*, 604 U.S. at 651; *see also Widakuswara v. Lake*, 2025 U.S. App. LEXIS 11036, *13 (D.C. Cir., May 3, 2025) (finding the Tucker Act likely deprived federal courts of jurisdiction over challenge U.S. Agency for Global Media's decision to rescind funding for Radio Free Asia and Middle East Broadcasting Network under the APA).

### D. The Court Lacks Jurisdiction to Review the Agencies' Discretionary Decisions Regarding How to Allocate Funds.

Even if the Court were to find that Plaintiff's claims are not moot, and that they are not contractual in nature, which they are, this Court still lacks jurisdiction. The APA precludes judicial review of agency decisions, likes those here, that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see, e.g., Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The allocation of funds from a

lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion.").

In *Lincoln*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was not reviewable under the APA's reasoned-decision-making standards. 508 U.S. at 185-88. There, the Court explained that Congress may have "circumscribe[d] agency discretion to allocate resources by putting restrictions in the operative statutes," but in the absence of such directives agencies may "allocate[] funds … to meet permissible statutory objectives." *Id*. at 193. "Of course," the Court went on, this discretion is not unbounded because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id*. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), courts may not "intrude." *Id*.

Although *Lincoln* addressed lump-sum appropriations, the D.C. Circuit has made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to

allocate lump-sum appropriations— "clearly requir[e] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted).

Consistent with *Lincoln*, courts have held that funding decisions are "committed to agency discretion." *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 290 (4th Cir. 2022) ("[D]ecisions that involve resource allocation and the need for flexibility to adapt to changing circumstances" are especially likely to fall beyond the APA's reach.) (citation omitted); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit."). Accordingly, an agency has discretion over how to spend the funds obligated to a statutory program, including whether to fund specific projects within that program.

In the Clean Air Act, Congress authorized EPA to determine where to send federal funding based on the agency-determined priorities, payment schedules, and terms: "The Administrator shall use amounts made available under subsection (a)(1) to award grants for periods of up to 3 years to eligible entities to carry out activities described in paragraph (2) that benefit disadvantaged

communities, *as defined by the Administrator*." 42 U.S.C. § 7438(b)(1) (emphasis added).

Plaintiff alleges that the operative word in this section is "*shall*," arguing it compels the EPA to obligate funds in support of the Environmental and Climate Justice Block Grant program. Doc. 1 at ¶ 14. However, Plaintiff fails to wrestle with the words "*as defined by the Administrator*," which grant the Administrator exclusive authority to determine which communities are disadvantaged and which activities would benefit such communities. Nothing in the statute requires that the Administrator continue to fund Plaintiff's grants specifically or provides any meaningful standard by which to judge the Administrator's determination to curtail funding to projects that do not, in the Administrator's view, properly advance the Administration's priorities. That language thus does not constrain the Administrator's discretion. Accordingly, the APA strips the Court of jurisdiction over Plaintiffs' claims which seek judicial review of the Administrator's specific decisions related to plaintiffs' specific grants.

At bottom, Plaintiff has the burden of showing subject matter jurisdiction and it cannot do so here for multiple reasons.

III. CONCLUSION

For the foregoing reasons, Defendants respectfully submit that Plaintiff's Complaint be dismissed.

24

Respectfully submitted,

THEODORE S. HERTZBERG
*United States Attorney*
*600 U.S. Courthouse*
*75 Ted Turner Drive SW*
*Atlanta, GA 30303*
*(404) 581-6000   fax (404) 581-6181*


/s/RODNEY H. ATREOPERSAUD
*Assistant United States Attorney*
Georgia Bar No. 309454
Rodney.Atreopersaud@usdoj.gov

**Certificate of Compliance**

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing brief has been prepared using Book Antiqua, 13 point font.

/s/RODNEY H. ATREOPERSAUD
*Assistant United States Attorney*

## Certificate of Service

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

March 6, 2026

/s/ RODNEY H. ATREOPERSAUD
RODNEY H. ATREOPERSAUD
*Assistant United States Attorney*